No. 58,537

In the Matter of R. KEITH MOUNTAIN, *Respondent.*

(721 P.2d 264)

Opinion filed June 13, 1986.

No appearance by respondent.

Roger N. Walter for disciplinary administrator.

A formal complaint was filed against R. Keith Mountain, attorney respondent, by Arno Windscheffel, disciplinary administrator, on January 10, 1985, alleging respondent violated the Lawyers Code of Professional Responsibility. Respondent answered denying he had violated his legal or ethical duty. A hearing before a disciplinary panel was held April 9 and May 3, 1985. Respondent appeared in person and by his attorney, Karl W. Friedel.

The panel made its final hearing report containing the following findings of fact and conclusions of law:

"1. The first contact the complainants, Rodney and Carol Mosier, had with the respondent, R. Keith Mountain, was through Dallas Schmidt, a staff worker at Reno County Health Department in [Hutchinson], Kansas, and this was by telephone conversation. Dallas Schmidt knew Mrs. Mosier. Edna Searles, the grandmother of the expectant mother, Angela Searles, informed Dallas Schmidt that the child was to be put up for adoption. Dallas Schmidt had been contacted by Mrs. Searles on November 9, 1983.

"2. Angela Searles had some mental or emotional problems. Her grandmother discussed this with Kris Friesen, a registered nurse at the W.I.C. Program. The condition was not genetic.

"3. Complainant[s] contacted the respondent on November 18, 1983, wherein the respondent agreed to represent the Mosiers for a fee of $500.00. Carol Mosier retained the respondent at that time.

"4. On November 22, 1983, Carol Mosier again contacted the respondent and agreed to send one-half of the fee to respondent.

"5. Respondent never contacted the birth mother until after he was retained by the Mosiers.

"6. Respondent also informed Mrs. Mosier that he was one of four recognized specialists in adoption in the state of Kansas. (Respondent later denied this statement.)

"Respondent stated that he would not contact the birth mother until he had received one-half of his fee. Mrs. Mosier gave respondent the name and address of the birth mother and grandmother, which was the Landmark Hotel in Hutchinson, Kansas.

"Shortly after talking to Mrs. Mosier, the respondent called the Landmark Hotel and charged the bill to the Mosiers' telephone bill.

"7. On November 23, 1983, respondent called the Mosiers and advised them that he was meeting with Angela and Edna Searles on November 28, 1983. This meeting never occurred.

"November 30, 1983, Edna Searles called Kris Friesen and told her that she was waiting to see a lawyer, that this was the second time a meeting had been set up. That he had not appeared for the first appointment.

"8. December 6, 1983, Mrs. Mosier called respondent to see how the adoption was progressing. Respondent stated that he had not met with the birth mother and Edna Searles.

"9. December 7, 1983, respondent called and said he would be meeting that day with Edna and Angela Searles.

"10. December 8, 1983, Mrs. Mosier called respondent, and respondent told her that the birth mother and grandmother were in need of financial assistance. Respondent suggested $300.00 and Mosiers agreed to send one-half immediately and the other half later.

"11. At this time, respondent's fee went up another $250.00. That the baby would be born February 15, 1984. This conversation was for twenty-three (23) minutes.

"12. December 12, 1983, check for $150.00 was sent to the respondent for the birth mother.

"13. December 13, 1983, Dallas Schmidt contacted the Mosiers and stated that the Searles were in financial trouble, and the Mosiers mailed another check for $150.00 to the respondent. Mrs. Searles later testified that the money was needed by her son who had car trouble in a trip up from Oklahoma. Both checks were deposited by the respondent. The respondent sent $300.00 to Edna Searles by check which bore the notation 'Tem. Mait. Adoption.'

"14. Respondent convinced Mrs. Searles that he was the attorney for Mrs. Searles and her granddaughter, Angela Searles. Edna Searles and Angela Searles paid no fees to the respondent. Angela Searles was on public assistance and Edna Searles, who testified in behalf of the respondent at the hearing, was a lady of little or no understanding of economics.

"15. In January of 1984, Edna Searles became convinced that Carol Mosier and her husband were not of sufficient wealth to adopt her granddaughter's child, although they had already given her (Mrs. Searles) $300.00 temporary maintenance. The respondent suggested other couples to adopt the child. Respondent advised Mrs. Searles she would receive $5,000.00 under a new arrangement with another adopting couple.

"16. On January 20, 1984, the W.I.C. program in Hutchinson received word that the adoption with the Mosiers was called off. Mrs. Searles, out of the hearing of Angela, stated that her lawyer, the respondent herein, did not think that the Mosiers had the financial substance to care for the child, and that Mr. Mosier had mental problems. That he doubted that they would be approved by the court for the adoption. He did not disclose to Mrs. Searles that a home study had already qualified them with excellent recommendations.

"17. January 19, 1984, respondent sent further funds to Edna Searles in the amount of $500.00 by check, which bore the notation 'Prenatal expenses.' There is no record who advanced these funds other than the respondent.

"18. On January 25, 1984, respondent called Carol Mosier and informed her that the fetus indicated some abnormalities; that family members were attempting to prevent the adoption, which would be 'messy'; that the Mosiers probably would lose the baby; Mrs. Searles would return the money; and that the Mosiers should abandon the adoption. Mrs. Mosier was saddened, but agreed not to go on with the adoption.

"19. The respondent had made prior arrangements with another couple to adopt the baby. This couple, on January 27, 1984, drew two checks payable to R. Keith Mountain Trust Account totaling $17,000.00. The Mosiers were not advised of these facts.

"20. February 6, 1984, Mrs. Mosier again called respondent and asked some questions about the adoption and medical tests. At that time the respondent became adamant and told Mrs. Mosier that the adoption was off.

"21. On February 7, 1984, a check for $250.00 was sent from respondent to Edna Searles with the notation 'Prenatal Expense.'

"22. February 10, 1984, Mosiers contacted Gerald Green, a Hutchinson attorney, who agreed to look into the case and advise them.

"23. February 10, 1984, respondent, by telephone, told Rod Mosier that he was not handling the adoption because the adoption was off. That he was handling only a matter of family harassment by the family.

"24. Gerald Green testified that the gynecologist that treated Angela Searles stated that the test on the fetus was normal. The respondent had never called him to determine the results of the tests, nor had the gynecologist contacted or talked to the respondent about any abnormalities of the fetus.

"25. On February 10, 1984, Angela Searles and her grandmother were moved by the respondent from the Landmark Hotel in Hutchinson to a motel in Wichita.

"26. On February 17, 1984, Angela Searles gave birth to a normal baby girl in a hospital in Wichita.

"27. The respondent handled the adoption of Angela Searles's baby by a second adoptive couple whose names have remained unknown to the panel. That the couple paid the respondent the sum of $17,000.00 in two checks dated January 27, 1984. The respondent claims that part of the money was for a fee earned earlier. That the adoption fee was $1,500.00.

"28. On February 18, 1984, respondent drew a check on his bank for $3,900.00 payable to Edna Searles, which was $5,000.00 less two prior checks of $500.00 and $250.00. That the respondent paid Wesley Medical Center $743.50 for post-birth care of the baby.

There is no showing as to where the balance of the money was allocated.

"29. On March 3, 1984, respondent returned $250.00 to Mr. and Mrs. Mosier, which was repayment of the attorney fees sent respondent.

"30. Respondent told Gerald Green that he represented the Mosiers, but the adoption was never completed. That he heard that Angela Searles had given the child to another couple. That he did not handle the adoption.

"31. On March 6, 1984, Gerald Green met with Edna Searles, who stated that the respondent handled the adoption of Angela's baby. That the respondent had selected the adoptive couple. She also told Green that the respondent had told her that the Mosiers were not qualified to adopt the baby.

"When informed of this information, the respondent denied that he had ever

represented the Mosiers, but his client was the birth mother and her grand-mother.

"32. Gerald Green wrote a letter to respondent dated March 23, 1984. . . . The letter advised respondent of the information learned from his investigation and threatened commencement of a legal action and ethical complaint unless an adequate explanation was provided.

"33. Thereafter, on March 27, 1984, respondent replied by letter to Mr. Green, contradicting his previous statements. Respondent, in that letter denied that he had ever represented the Mosiers and stated that throughout the entire process, he had only represented Angela and Edna Searles. That letter also stated that on virtually all adoptions handled by the respondent, he only represents the birth mother and that this fact was well known to those who practice in the adoption field. . . . In a prior hearing on another disciplinary complaint also involving an adoption, In the Matter of R. Keith Mountain, No. W3188, the respondent gave sworn testimony indicating that in adoptions handled by him, he primarily represented the adoptive parents and would represent birth mothers only when specifically asked to by the adoptive parents.

"34. The $300.00 advanced to Edna Searles through the respondent has never been returned.

"35. Respondent's wife, Carol Abrahams Mountain, a licensed social worker, advertised in the Yellow Pages of the local telephone directory that she handled adoption services, pregnancy counseling and adoptive counseling. She used her husband's telephone number and law office address. Respondent and his wife denied that any business was obtained through the advertisement.

"36. That the trust account of the respondent's law firm was held in joint tenancy with his wife. That the account was used for personal expenses. That no client has complained of losing funds therein. That the account is now properly maintained, although it was overdrawn on November 16, 1983 and February 27, 1984.

"37. The panel found discrepancies in the respondent's testimony as compared to the letters written to Green and to the Wichita Bar Association.

## CONCLUSIONS OF LAW

"1. The respondent represented Rod and Carol Mosier, and at the same time represented another couple who adopted the Searles baby, contrary to DR 5-104(A) inasmuch as there were conflicting interests.

"2. That the respondent, in advising the Mosiers that the fetus indicated abnormalities when in reality he had not conferred with the gynecologist, is contrary to DR 1-102(A)(3)(4). That his false statements to a client violated DR 7-102(A)(3).

"3. That the respondent failed to carry out a contract of employment contrary to DR 7-101(A)(1)(2) and (3).

"4. That the false statements to Gerald Green were contrary to DR 1-102(A)(4).

"5. That the respondent served as a procurer of a baby for adoption, which is morally repugnant and contrary to DR 1-102 (A)(5) and (6).

"6. That the fee collected from the final adoptive parents was clearly excessive contrary to DR 2-106(A).

"7. That the respondent advanced funds to Edna Searles contrary to DR 5-103(B).

"8. That the respondent's trust account was not properly maintained, contrary to DR 9-102(A) and (B)(3), although there is no evidence of any complaint by a client."

Respondent took exceptions to the panel's final hearing report and took this appeal. Respondent neither filed a brief nor appeared for oral argument though properly notified.

We have examined the record and find substantial competent evidence to support the findings of fact of the hearing panel. The facts support the panel's conclusions of law that respondent violated the following sections of Supreme Court Rule 225, Code of Professional Responsibility (235 Kan. cxxxvii *et seq.*); DR 5-104(A); DR 7-101(A)(1), (2), and (3); DR 1-102(A)(4), (5), and (6); DR 2-106(A); DR 5-103(B); and DR 9-102(A) and (B)(3).

We conclude the panel's recommendation that respondent be disbarred is appropriate.

IT IS THEREFORE ORDERED that R. Keith Mountain be and he is hereby disbarred from the practice of law in the State of Kansas and the Clerk of the Appellate Courts is directed to strike his name from the rolls of attorneys authorized to practice law in the State of Kansas.

IT IS FURTHER ORDERED that R. Keith Mountain shall forthwith comply with the provisions of Supreme Court Rule 218 (235 Kan. cxxxii).

IT IS FURTHER ORDERED that the costs of this action be assessed to respondent.